Filed 7/26/22 P. v. Harris CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B309923 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA097480-01) |
| v. | |
| RASHAD HARRIS, | **ORDER MODFYING OPINION** [There is no change in judgment] |
| Defendant and Appellant. | |

BY THE COURT:

It is ordered that the opinion filed herein on July 22, 2022, is modified as follows:

On the caption page, first sentence in the first paragraph, delete Hayden A. Zacky, and replace it with Lauren Weis-Birnstein.

There is no change in judgment.

RUBIN, P. J.          BAKER, J.          KIM, J.

Filed 7/22/22 P. v. Harris CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on, opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RASHAD HARRIS,<br><br>    Defendant and Appellant. | B309923<br><br>(Los Angeles County<br>Super. Ct. No. SA097480-01) |

APPEAL from an order of the Superior Court of Los Angeles County, Hayden A. Zacky, Judge. Affirmed.

Jennifer A. Mannix for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez, Deputy Attorney General, and William H. Shin, Deputy Attorney General, for Plaintiff and Respondent.

———————————————

## *INTRODUCTION*

Defendant appeals from his convictions for assault with intent to commit rape during the commission of a burglary, burglary, robbery, assault with a deadly weapon, mayhem, and criminal threats. He argues his trial counsel's decision to concede his guilt on some of the charges violated his right to counsel because he did not consent to the strategy. He also claims that jury instruction CALCRIM No. 372 on flight/consciousness of guilt was unconstitutional under the circumstances of his case. We affirm.

## *FACTS AND PROCEDURAL BACKGROUND*

### *1.    The Burglary and Assault*

In February 2018, defendant broke into the victim's apartment around 3:00 a.m.[1] Defendant threatened the victim with a knife from her kitchen. After she gave him the cash she had in a nightstand, defendant held a knife to her neck and sexually assaulted her. He massaged her breast and vagina, asked for a condom, and pressed his erection against her body. The victim believed defendant was about to rape her. When defendant briefly moved the knife away from her neck, the victim fought defendant with her fists and feet (and eventually with objects in her home). Defendant slashed at the victim with the knife, causing multiple lacerations and serious injury to her head, arm, and hand. After struggling with the victim, defendant fled the apartment.

### *2.    Police Investigation*

Police investigated and found defendant's fingerprints on the window through which the assailant had entered. A trail of

---

[1]    In accord with the usual rules on appeal, we state the facts in the manner most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

blood led out of the victim's apartment and onto the street. Following the blood drops, officers discovered the knife that had been taken from the victim's apartment and the assailant's blood-stained clothing – gray sweatpants with a large bloodstain on the right leg and a red beanie.

DNA testing revealed that defendant's blood was present on the knife, in various areas inside the victim's apartment, on the front door, and on the blood trail leading out of the apartment. Blood collected from the gray sweatpants matched both defendant's and the victim's DNA profiles.

Police obtained the surveillance video footage from the hotel located directly next to the victim's apartment building. The video showed that at 12:56 a.m., a person resembling defendant walked behind the hotel towards the victim's apartment building.

Police reviewed the video surveillance footage from a building located along the blood trail from the period of time immediately after the burglary. The video showed a man resembling defendant walking along the blood trail and eventually into an apartment complex, where the bloody sweatpants were found. Shortly thereafter, the same man left the apartment complex wearing a different top and bottoms (a black-and-white checkered shirt and blue jeans), but still wearing the same backpack. The trail of blood drops led to a nearby Metro train station.

The surveillance video footage from the Metro station showed that at 4:22 a.m., a Black man in his 20's, who was wearing a black-and-white checkered shirt and blue jeans and carrying a backpack, appeared on the platform. The man appeared to be bleeding from his right hand. He eventually boarded a Metro train.

Between 5:00 a.m. and 6:00 a.m., a Metro railroad supervisor at the Santa Monica rail maintenance facility was notified by one of the car cleaners that there was blood found in one of the train cars. After inspecting the car and discovering "a lot of blood," the supervisor took the car out of service and called the police.

Around 9:00 a.m. that morning, defendant sought treatment for a laceration to his hand and was admitted to a hospital. Defendant told the treating physician's assistant he had sliced his hand earlier in the morning while cutting apples. The assistant treated defendant's hand wound with sutures. Video footage from the hospital showed defendant walking through the emergency room entrance.

The assailant also left a cellphone in the victim's bedroom. The cell phone was linked to two Facebook accounts—one in defendant's name and another with the user name "Yeeboi Harris." Both Facebook profiles displayed photographs of a Black man resembling defendant, including photographs of the Black man wearing a red beanie and light-colored sweatpants similar to the red beanie and bloody pants found along the blood trail. The Facebook profiles also had a photograph depicting a backpack similar to the one worn by the assailant.

At the time of his arrest four days after the attack, defendant was still wearing the hospital identification bracelet provided during his medical treatment. Defendant also had a cut across his right index finger which had been treated with stitches. His jeans had red blood stains in the right thigh area. Underneath the jeans, defendant was wearing a pair of basketball shorts which also had a blood stain on the right thigh. There was a straight cut through the bloodstain on the basketball shorts. Defendant had what appeared to be a puncture wound on his right leg.

4

Police arrested defendant on February 27, 2018. When interviewed, defendant said that his cell phone had been lost or stolen on February 20 or 21, 2018. Defendant also denied owning or wearing the beanie and bloody sweatpants, and said he had not been in Santa Monica since January 2018. Defendant told police his DNA would not be found on the clothing or the knife police recovered.

While in jail, defendant made several phone calls, which were recorded and played to the jury. During these calls, defendant stated, "I punched the girl, and but then she slipped, but [¶] . . . [¶] I'm not going down for nothing else." He also stated, "My phone did drop, my phone didn't drop in the motherfucking house." Defendant asked one caller to remove a photograph posted on Facebook that depicted defendant wearing the red beanie. Finally, defendant asserted he was defending himself from "a chicken head that fucking stabbed me in the fucking finger and stabbed me in the fucking leg."

A few weeks after the incident, police showed the victim a six-pack photographic lineup, and the victim identified defendant as her attacker.

### 3. Charges and Pretrial Proceedings

In an information, the People charged defendant with the following counts: (1) assault with intent to commit rape during the commission of a first degree burglary, (2) first degree burglary, (3) first degree residential robbery, (4) assault with a deadly weapon, (5) aggravated mayhem, and (6) criminal threats. For counts 1 through 4, the information alleged defendant personally inflicted great bodily injury. For all counts, the People alleged defendant had one prior serious and/or violent felony conviction, and one prior serious felony conviction.

During pretrial proceedings, defendant exhibited disruptive behavior and the court ordered a mental health evaluation. A

5

doctor found defendant competent and trial proceedings were reinstated.

On the day scheduled for the preliminary hearing, the court issued an extraction order because defendant refused to come to court. Due to defendant's late arrival, the preliminary hearing was continued to a later date.

At the next hearing, defendant interrupted the court on multiple occasions. After several warnings, the court ordered defendant removed from the courtroom, and proceeded with the preliminary hearing in his absence.

After the preliminary hearing, defendant continued his disruptive behavior and had to be removed from the courtroom. He ultimately refused to come to court, repeatedly leaving or insisting to leave when he was brought to court.

## 4.    *Trial*

On October 21, 2020, the jury trial commenced. Defendant refused to attend any of his trial. He also refused to listen to the testimony and evidence presented during trial over a speaker installed in a jail cell.

The People presented testimony from the victim, law enforcement officers, criminalists, the Metro railroad supervisor, the victim's surgeon, and the physician's assistant who treated defendant's hand. Defendant presented no evidence.

During an ex parte hearing on November 5, 2020, defense counsel informed the court that she had a "*McCoy* issue" because she intended to concede certain charges and focus on challenging the specific intent element on the more serious charges. (See *McCoy v. Louisiana* (2018) 584 U.S. __ [138 S.Ct. 1500, 1505] (*McCoy*) [it is unconstitutional for defense counsel to concede guilt over the defendant's intransigent and unambiguous objection].) She informed the court that communications had broken down between her and defendant, but she had previously

6

discussed her strategy with defendant many times and he had expressed no objection. After questioning defense counsel about her discussions with defendant, the court concluded there was no *McCoy* issue.

In her closing argument on December 4, 2020, defense counsel argued there was insufficient evidence to prove that defendant intended to rape the victim, one of the elements in assault with the intent to commit rape during a burglary (count 1), or that defendant had the specific intent to maim the victim, as required for aggravated mayhem (count 5). Counsel told the jury: "The question here for you isn't if [defendant] is guilty; the question is what is he guilty of. He's not guilty of count 1 [assault with intent to commit rape during a burglary] because the specific element requirement wasn't met, not its lesser, and not count 5. The standard of proof, it's high . . . . You don't have proof beyond a reasonable doubt for those elements. Please don't allow your empathy for [the victim], which we all have, or your anger against [defendant] to make up for the lack – or the evidence, the lack of evidence of intention to rape." (We discuss defense counsel's closing argument in greater detail below.)

In her closing to the jury, the prosecutor argued that defense counsel had acknowledged that defendant was guilty of some crimes. She told the jury the People's position was that defendant was guilty on all counts.

On December 7, 2020, the jury convicted defendant of all counts except for aggravated mayhem. On that count, the jury convicted him of the lesser included offense of simple mayhem. The jury found true the great bodily injury enhancement. On

January 6, 2021, the court sentenced defendant to life in prison with the possibility of parole, plus three years.[2]

Defendant timely appealed.

## DISCUSSION

Defendant raises two issues on appeal. He asserts his convictions for counts 2, 3, 4, and 6 must be reversed because of *McCoy* error: defendant did not consent to his trial counsel's strategy of conceding substantive charges. He also contends that CALCRIM No. 372, which permits jurors to infer consciousness of guilt based upon a defendant's flight, was unconstitutional as applied to him because it discriminates against people of color, like defendant. We address each issue in turn.

1. ***Defendant's Sixth Amendment Right to Counsel Was Not Violated By Counsel's Concession of Guilt on Some Charges***

Defendant contends that defense counsel improperly conceded his guilt when counsel asserted at closing that defendant was essentially guilty of committing the burglary, residential robbery, assault with a deadly weapon, and criminal threats as charged on counts 2, 3, 4, and 6. Relying on *McCoy, supra,* 138 S.Ct. 1500, defendant argues that his trial attorney violated his Sixth Amendment right to counsel by failing to fully inform him of the trial strategy and by overriding his desire to maintain his innocence and pursue full acquittal. "We review the legal question of whether defendant's constitutional rights were

---

[2]     Penal Code section 220, subdivision (b) (count 5) provides: "Any person who, in the commission of a burglary of the first degree, as defined in subdivision (a) of Section 460, assaults another with intent to commit rape, sodomy, oral copulation, or any violation of Section 264.1, 288, or 289 shall be punished by imprisonment in the state prison for life with the possibility of parole."

violated de novo." (*People v. Palmer* (2020) 49 Cal.App.5th 268, 280.)

### a. Relevant Proceedings

Defendant was uncooperative with his counsel and in court. Ultimately, communication broke down between defendant and defense counsel. Defendant chose not to attend a single day of his trial, and even refused to listen to the trial via a radio in his cell.

During an ex parte hearing held midtrial on November 5, 2020, defense counsel informed the court that she had a "*McCoy* issue" because she intended to concede certain charges and focus on challenging the specific intent element on the more serious charges. Defense counsel stated: "I do want it to be on the record that I have tried to speak to [defendant] about this for at least a year, if not longer. I've brought it up several times, and the court's seen the way he behaves. And he -- I mean, he's heard me say it. So I just want that on the record." The court then asked: "at the time you explained your strategy to him, was he behaving in a rational manner and did he appear to absorb the information?" Defense counsel answered, "Yeah."

Defense counsel elaborated on her discussions with defendant:

"[Defense counsel]: Early on, when he and I were able to communicate, I did tell him that this is really his only path to something good happening for him. And . . . at that time he never said, 'No. Don't do that.' He never said, "That's a wrong way to go." So that's for sure.

"The Court: Okay. So you have discussed it with him?

"[Defense counsel]: Yes.

"The Court: So your prior statement that you need to discuss it with him, you've already done that?

9

"[Defense counsel]: Oh yeah. No. I wasn't saying I need to. I wanted it to be on the record that I have . . . and . . . that he's never told me not to pursue that . . . strategy. . . . But then I wanted to add that, since the breakdown of communication has happened in the last year or so, I've tried to bring it up again just to make sure that we're on the same page. And, you know, obviously, at that point, we're not communicating anymore.

"The Court: Right. That's just not possible at this time. But that's why I asked you specifically when you did discuss it with him -- how many times did you discuss it with him when he was . . . open to listening to you?

. . .

"[Defense counsel]: We've had the discussion on many occasions. But, you know, obviously, early on I was hoping there would be an offer. And so he and I weren't talking trial strategy. It was a discussion of 'here's what I see in the case. Here's where the issues are.' And there was never any kind of conversation of 'No. That's not the way to analyze this.' Get what I'm saying? Without divulging attorney-client privilege, which I can't do, what I'm saying is that I did present that to him and I was not told at any time that I'm on the wrong path.

"The Court: . . . And that was on how many occasions?

. . .

"[Defense counsel]: Like ten times at least."

The court found that "the record is very clear that you did make your strategy known to [defendant]" and "[h]e did not object."

During closing argument, defense counsel stated: "It is clear there are crimes for which there was evidence and which

10

have been proven beyond a reasonable doubt. There's no doubt about that. Those are not the crimes I want to talk about to you. Those crimes, every element has been proven and proven beyond a reasonable doubt. I have no quarrel with that. You received D.N.A. evidence, fingerprint image; you've received conversations that were recorded, et cetera. For the charges that those are related to, I have no dispute with that. [¶] But there are also crimes that the District Attorney has failed to prove beyond a reasonable doubt. Specifically, count 1, . . . the assault with intent to commit rape during the commission of a burglary; its lesser count, assault with intent to rape; and then count 5, the aggravated mayhem charge."

Counsel then pointed out disparities in the victim's testimony and the physical evidence. Counsel argued that the district attorney had not proven the specific intent necessary for counts one and five. A few minutes later, she closed her presentation to the jury with the same point.

b.    *Applicable Law*

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) "To gain assistance, a defendant need not surrender control entirely to counsel. . . . Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' [Citations.] Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*McCoy, supra*, 138 S.Ct. at p. 1508.) "Autonomy to decide that the objective of the defense is to assert innocence belongs in this

11

latter category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to achieve a client's objectives; they are choices about what the client's objectives in fact are." (*Ibid*.) Therefore, "When a client expressly asserts that the objective of 'his defense' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (*Id*. 138 S.Ct. at p. 1509.)

In *McCoy*, the defendant faced the death penalty for three murders. (*McCoy, supra*, 138 S.Ct. at pp. 1505-1506.) McCoy's attorney "concluded that the evidence against McCoy was overwhelming and that, absent a concession at the guilt stage that McCoy was the killer, a death sentence would be impossible to avoid at the penalty phase." (*Id*. at p. 1506.].) McCoy was furious with his counsel's plan to admit guilt to the murders and adamant that counsel pursue acquittal. (*Ibid*.) Two days before trial, McCoy sought to terminate his lawyer's representation based on their disagreement. The court declined to relieve counsel and instructed counsel to decide how to proceed at trial. (*Ibid*.)

In his opening statement, the defense counsel "told the jury there was 'no way reasonably possible' that they could hear the prosecution's evidence and reach 'any other conclusion than Robert McCoy was the cause of these individuals' death,' " and "the evidence is 'unambiguous,' 'my client committed three murders.' " (*McCoy, supra*, 138 S.Ct. at pp. 1506-1507.) McCoy protested (out of the jury's earshot) to no avail. (*Ibid*.) McCoy then "testified in his own defense, maintaining his innocence and

12

pressing an alibi difficult to fathom." (*Id*. at p. 1507].) In the closing argument, defense counsel reiterated McCoy was the killer. The jury returned guilty verdicts on the three first degree murder charges. In the penalty phase, the attorney again conceded McCoy's guilt but asked for mercy in view of McCoy's mental and emotional issues. The jury then voted for the death penalty. (*Ibid*.)

The United States Supreme Court held "that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." (*McCoy, supra*, 138 S.Ct. at p. 1507.) The court went on to state: "Guaranteeing a defendant the right 'to have the Assistance of Counsel for his defen[s]e,' the Sixth Amendment so demands. With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." (*Ibid*., italics omitted.) The Court summarized: "counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission." (*Id*. at p. 1510.) The court held the error was structural and remanded for a new trial. (*Id*. at p. 1512.)

  c. *No* McCoy *Error*

*McCoy* is distinguishable from the present case because, unlike defendant, McCoy "vociferously" insisted he did not commit the charges and "adamantly" objected to his counsel's plan to admit defendant's guilt. (*McCoy, supra*, 138 S.Ct. at p. 1505.) Here, defendant never expressed an objection regarding counsel's strategy to admit guilt to some charges. That defendant pleaded not guilty at the outset does not show an objection to his

13

counsel's concession strategy. (See *People v. Flores* (2019) 34 Cal.App.5th 270, 282 ["pleading 'not guilty' is not the same as maintaining innocence of the alleged acts throughout trial, which as *McCoy* explains a defendant is entitled to do under the Sixth Amendment"].) Concession of some charges is a strategy to lessen a defendant's potential sentence: "candor may be the most effective tool available to counsel." (*People v. Mayfield* (1993) 5 Cal.4th 142, 177.)

Here, when counsel, on several occasions, advised defendant her trial strategy, defendant did not object.[3] Instead, defendant later completely disengaged from communicating with counsel and participating in his defense. There cannot be *McCoy* error where a defendant communicates nothing to his counsel when she informs him of her strategy. "California courts following *McCoy* repeatedly have held that case applies only where defendant actively opposes counsel's concession." (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1056; see also *People v. Franks* (2019) 35 Cal.App.5th 883, 891 [refusing to find *McCoy* error where "defendant denied guilt during police interrogations and expressed a general desire to review discovery and help his lawyer 'fight' the prosecution's evidence, [but n]ever made it clear to his counsel (or the court) that the objective of his defense was to maintain innocence, [nor] . . . voiced 'intransigent objection'— or any opposition—to his lawyer's defense strategy"]; *People v. Lopez* (2019) 31 Cal.App.5th 55, 66 ["we have found no authority, nor has [the defendant] cited any, allowing extension of *McCoy*'s

---

[3] To the extent defendant asserts on appeal he was not informed of the concession strategy, nothing in the record supports this contention. What the record reflects is that defense counsel informed the court that she had discussed the strategy at least 10 times with him. Nor is there anything in the record that defendant did not understand what he was told.

holding to a situation where the defendant does not expressly disagree with a decision relating to his right to control the objective of his defense"].)

Earlier this year, our Supreme Court considered this issue under circumstances that distinguish *McCoy* from the several court of appeal cases that have found *McCoy* inapplicable. In *People v. Bloom* (2022) 12 Cal.5th 1008, 1036, "Bloom willingly conceded that he killed [his father]. But before trial, Bloom repeatedly objected to his attorneys' plan to concede Bloom also killed [his stepmother and stepsister], and to pursue a mental capacity defense as to all three killings. Despite Bloom's objections, at trial defense counsel told the jury that Bloom killed the three victims, but argued Bloom's mental state rendered those actions manslaughter, not first degree murder. Bloom argues that counsel's concessions violated his Sixth Amendment right of autonomy over the defense under *McCoy v. Louisiana, supra*, 584 U.S. —— [138 S.Ct. 1500] (*McCoy*). We agree in part: counsel's decision to concede Bloom killed [his stepmother and stepsister], despite Bloom's insistence to the contrary, violated Bloom's right to determine the objectives of the defense and maintain complete innocence as to these counts. But we disagree as to the killing of Bloom, Sr., for which Bloom consistently accepted responsibility. Once Bloom agreed to admit he killed his father, how best to secure acquittal or conviction of a lesser offense was a tactical matter vested with counsel." The Supreme Court reversed the convictions for the murder of the stepmother and stepsister, but affirmed the murder conviction as to Bloom's father. (*Id* at pp. 1041-1042, 1061-1062.)

Defendant asserts that in order for defense counsel to legally concede defendant's guilt on some charges, defendant had to expressly and knowingly waive his constitutional rights. That is not the law. Our Supreme Court has explicitly held that "trial

15

counsel's decision not to contest, and even expressly to concede, guilt on one or more charges at the guilt phase of a . . . trial is not tantamount to a guilty plea requiring a *Boykin–Tahl* waiver. [Citations.] It is not the trial court's duty to inquire whether the defendant agrees with his counsel's decision to make a concession, at least where, as here, there is no explicit indication the defendant disagrees with his attorney's tactical approach to presenting the defense." (*People v. Cain* (1995) 10 Cal.4th 1, 30.) Likewise, our High Court in *Florida v. Nixon* (2004) 543 U.S. 175, stated that when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, (*id.* at p. 181) "[no] blanket rule demand[s] the defendant's explicit consent" to implementation of that strategy. (*Id.* at p. 192.)

Defendant argues this reasoning is no longer valid because *McCoy* characterized "the choice of defense objective as a fundamental constitutional choice" and thus "a knowing and voluntary waiver is required on the record when defense counsel argues for a guilty verdict."

*McCoy* did no such thing. The opening four sentences of the Supreme Court's opinion are: "In *Florida v. Nixon*[, *supra,*] 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 [ ], this Court considered whether the Constitution bars defense counsel from conceding a capital defendant's guilt at trial 'when [the] defendant, informed by counsel, neither consents nor objects,' *id.,* at 178, 125 S.Ct. 551[ ]. In that case, defense counsel had several times explained to the defendant a proposed guilt-phase concession strategy, but the defendant was unresponsive. *Id.,* at 186, 125 S.Ct. 551. We held that when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, *id.,* at 181, 125 S.Ct. 551[ ], '[no] blanket rule demand[s] the defendant's

16

explicit consent' to implementation of that strategy, *id.,* at 192, 125 S.Ct. 551[ ]. [¶]  In the case now before us, in contrast to *Nixon,* the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." (*McCoy, supra*, 138 S.Ct. at p. 1505.)

Defendant here did not "vociferously insist[ ] that he did not engage in the charged acts and adamantly object[ ] to any admission of guilt." (*McCoy, supra*, 138 S.Ct. at p. 1505.)  He voiced no objection at all.

We agree with our colleagues in other courts of appeal and hold defendant's Sixth Amendment rights were not violated when defense counsel conceded several charges in an effort to gain acquittal on the two most serious charges, both of which carried a life sentence.  (See *People v. Villa, supra,* 55 Cal.App.5th 1042; *People v. Franks, supra,* 35 Cal.App.5th 883; *People v. Lopez, supra,* 31 Cal.App.5th at p. 66; *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1166; *People v. Burns* (2019) 38 Cal.App.5th 776.)

**2.      *No Error in Instructing the Jury with CALCRIM 372***

Defendant argues the trial court erred in instructing the jury on CALCRIM No. 372.  Defendant is African American.  He asserts CALCRIM No. 372 discriminates against people of color because, given a culture of racially disparate policing, it is always fundamentally unfair to infer that a person of color would flee from police to escape responsibility for criminal acts.  Defendant contends CALCRIM No. 372 "enshrines" "institutional racism" and violates federal due process protections when given in a case where the defendant is a person of color.

We initially observe that CALCRIM No. 372 does not mention flight from police but immediate flight from a crime.[4] There is no evidence in the record that defendant fled from police in an effort to avoid arrest.

a.    *Forfeiture*

Respondent argues defendant forfeited this argument because counsel did not object to the instruction.  Defendant acknowledges that defense counsel did not object to CALCRIM No. 372 in the trial court.  He insists that because the instruction violates his due process right, defense counsel's failure to object did not forfeit the issue on appeal.

"As a general rule, failure to object to an instruction forfeits the issue on appeal."  (*People v. Campbell* (2020) 51 Cal.App.5th 463, 498.)  There are some exceptions.  (See, e.g., *People v. Capistrano* (2014) 59 Cal.4th 830, 875, fn. 11, overruled on a different point in *People v. Hardy* (2018) 5 Cal.5th 56, 104.) Where "a defendant asserts that an instruction is incorrect in law an objection is not required."  (*Capistrano, at p. 875, fn. 11.*)

Constitutional challenges are generally placed in one of two categories.  "A facial challenge 'considers only the text of the measure itself, not its application to the particular circumstances of an individual.' [Citation.]  In contrast, an as-applied challenge 'contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular

---

[4]    As given to the jury, CALCRIM No. 372 provided:  "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

circumstances the application deprived the individual to whom it was applied of a protected right.' " (*People v. Superior Court (J.C. Penney Corp., Inc.)* (2019) 34 Cal.App.5th 376, 387.)  To prove an as-applied challenge, "the [party] must establish the particular application of the statute violates the [party's] constitutional rights."  (*Ibid.*)

In this case, defendant does not assert CALCRIM No. 372 is unconstitutional, as written.  He admits "it appears neutral on its face."  Rather, defendant makes an as-applied challenge to the instruction, claiming that it discriminates against him as an African American because it fails to acknowledge that people of color flee from police due to racially disparate policing practices.  Defendant's argument on appeal presumes facts missing from the evidence, i.e., that he fled the victim's apartment for reasons other than his consciousness of guilt and the statistical or study-based information to support his policing claims.  No direct or circumstantial evidence supports his contention.

Nor does defendant's challenge present a pure question of law, but rather an alleged "constitutional defect [that] may be correctable only by examining factual findings in the record or remanding to the trial court for further findings."  (*In re Sheena K.* (2007) 40 Cal.4th 875, 887.)  Defendant's failure to assert this fact-specific, as-applied argument in the trial court forfeits the argument on appeal.  (Cf., *People v. Guzman* (2018) 23 Cal.App.5th 53, 63, fn. 3 [probationer forfeited as-applied constitutional challenge to probation condition by failing to object].)

b.    *Error, if Any, Was Harmless*

Even if we were to address the merits, we would affirm for lack of prejudice.  We may not reverse defendant's convictions unless the record, as a whole, demonstrates the error was harmless beyond a reasonable doubt.  (*People v. Jarrell* (1987)

19

196 Cal.App.3d 604, 608 citing *Rose v. Clark* (1986) 478 U.S. 570, 580 [applying "harmless beyond a reasonable doubt" standard from *Chapman v. California* (1967) 386 U.S. 18, 24, to constitutional challenges to jury instructions].)

Any error was harmless beyond a reasonable doubt. First, defense counsel admitted his client committed the first degree burglary, first degree residential robbery, assault with a deadly weapon, and criminal threats. Consciousness of guilt is not even an issue on appeal for those charges even though his flight from the scene was the same for all charges.

Defendant's DNA and dropped cell phone placed him at the scene of the crime. Defendant's fingerprints on the victim's window showed that he broke into and entered the victim's apartment. The victim identified defendant as her assailant. Injuries on both defendant and the victim as well as the knife (which had their blood on it) corroborate the victim's testimony regarding defendant's attack. There was no evidence in the record to explain defendant's presence in the victim's apartment other than for the purpose of the burglary and assault.

For this same reason, defendant's ineffective assistance of counsel claim for failure to object to the instruction also fails. (*In re Hardy* (2007) 41 Cal.4th 977, 1018 [to obtain reversal for ineffective assistance, defendant must show he was prejudiced, i.e., there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different].)

/ / /

/ / /

20

### *DISPOSITION*

The judgment is affirmed.

RUBIN, P.J.

WE CONCUR:

BAKER, J.

KIM, J.